OA 91 Criminal Complaint

# United States District Court

NORTHERN DISTRICT OF CAILFORNIA

UNITED STATES OF AMERICA
V.
FERNANDO GUZMAN, CARLOS NAVARRO, HERNAN MARTINEZ, and FRANCISCO TIJERO,

**CRIMINAL COMPLAINT**

Case Number: 4 - 08 - 70344 WDB

FILED
JUN 1 2 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

ORIGINAL

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about 4/13/, 4/22/, 4/30, 5/15, 6/3/2008 (Date) in Alameda County, in the Northern District of California defendant(s) did,

(Track Statutory Language of Offense)

did knowingly and intentionally conspire, and possess, with intent to distribute heroin, a Schedule I substance, including more than 500 grams, and methamphetamine, a Schedule II substance, including more than 500 grams.

in violation of Title 21 United States Code, Section(s) 841(a)(1); 846

PENALTIES: Heroin: 5 to 40 years imprisonment; $2,000,000 fine; 4 years term supervised relese; $100 special assessment.
If prior: 10 years to life imprisonment; $4,000,000 fine; 8 years term supervised release; $100 special assessment.
Methamphetamine: 10 years to life imprisonment; $4,000,000 fine; 5 year term supervised release; $100 special assessment.
If prior: 20 to life imprisonment; $8,000,000 fine; 10 year term supervised release.

I further state that I am a(n) Task Force Officer Eric Karsseboom and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

Approved As To Form: KIMBERLY M. BRIGGS AUSA

Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

Date at San Francisco, California
City and State

BERNARD ZIMMERMAN   U.S. Magistrate Judge
Name & Title of Judicial Officer        Signature of Judicial Officer

IN THE UNITED STATES DISTRICT COURT

STATE OF CALIFORNIA

COUNTY OF ALAMEDA

## AFFIDAVIT

I, Eric Karsseboom, being duly sworn, do hereby depose and state:

1. I am a Police Officer with the Oakland Police Department, Oakland, California. My duties and responsibilities involve the investigation of criminal violations of the Controlled Substances Act (Title 21, United States Code) and other duties imposed by law.

2. I have been a Police Officer for 14 years. From September 1993 to August 1994, I was a Police Officer with the Fremont Police Department (FPD), Fremont, California. At FPD, I was assigned to the Patrol Division. From August 1994 to January 1996, I was a police Officer with the Oakland Housing Authority Police Department (OHAPD), Oakland, California. At OHAPD, I was assigned to the Patrol Division and the Drug Elimination Unit. In January 1996, I was appointed as a Police Officer with the Oakland Police Department (OPD), Oakland, California. At OPD, I have been assigned to: the Patrol Division, the Crime Prevention Unit, the Vice Narcotics Unit, the Juvenile Intake Unit, the Special Victims Unit, the Target Enforcement Task Force, and the Gang Unit. In June 2006, I became a narcotic detection canine handler. Since August 2007, I have been assigned to the Drug Enforcement Administration (DEA), San Francisco Field Division, Oakland Resident Office, Group One Task Force.

3. I have received approximately 376 hours of training in the detection, recognition, and investigation of narcotics and other controlled substances. My formal education consists of, but is not limited to, the following: A Bachelor of Arts degree in Criminal Justice from California State University, Hayward and a Masters of Public Administration from the University of San Francisco, San Francisco. I have spoken with several hundred persons who use and sell narcotics and other controlled substances. I am familiar with the terminology used concerning narcotics and other controlled substances. I am familiar with the appearance, packaging, use, and sales methods of narcotics and other controlled substances. I have been involved in well over 2000 arrests of persons for the possession of narcotics, the possession of narcotics for sales, the sales of narcotics and other controlled substances. I have purchased and sold (*bunk*) narcotics in an undercover capacity. I have testified as a

1

marijuana, heroin, cocaine, rock cocaine, and MDMA expert in the Alameda County Superior Court.

3. I am participating in a DEA investigation concerning the distribution and sales of controlled substances, specifically heroin and methamphetamine. This affidavit contains information I believe establishes probable cause for this application. I make this affidavit in support of a criminal complaint for the defendants in this matter, Fernando Guzman, Carlos Navarro, Hernan Martinez, and Francisco Tijero.

4. I make this affidavit based on personal knowledge derived from my participation in this investigation and, in part, upon information from oral and written reports that I have received from other OPD Officers and DEA Special Agents. Not all of the facts known to me about this investigation are included within this affidavit. I have set forth only the facts I believe necessary to establish probable cause to believe the defendants, Fernando Guzman, Carlos Navarro, Hernan Martinez, and Francisco Tijero did knowingly and intentionally conspire, and possess, with intent to distribute heroin, a Schedule I substance, including more than 500 grams, in violation of Title 21 United States Code, Sections 841(a)(1) and 846 and methamphetamine, a Schedule II substance, including more than 500 grams, in violation of Title 21 United States Code, Sections 841(a)(1) and 846.

5. On April 13, 2008, at approximately 09:00 am, the DEA Task Force and the OPD had knowledge of a person who is involved in the sales of heroin, cocaine, and methamphetamine in the City of Oakland. Through surveillance and a vehicle traffic enforcement stop, we identified the above person as Fernando Guzman, a male Hispanic with a date of birth of         . We also identified Guzman's primary vehicle as a 1986 Volkswagen Jetta 4 door red with California license plate 4WNY902 and Guzman's residence as

6. On April 22, 2008, at approximately 2:00 pm, the DEA Task Force and the OPD planned a buy-walk operation. Undercover OPD Officer L. Sanchez 8181P previously arranged a narcotic transaction with Guzman at 9725 International Blvd, Oakland (*McDonald's* parking lot) on April 22, 2008, at approximately 03:00 pm. Guzman agreed to sell 5 ounces of heroin to Officer Sanchez in exchange for 1,750.00 dollars in U.S. currency.

7. At approximately 3:34 pm, Guzman arrived at 9725 International Blvd (*McDonald's* parking lot). Officer Sanchez entered Guzman's vehicle. Officer Sanchez and Guzman completed the narcotic transaction. Guzman gave approximately 5 ounces of heroin to

2

Officer Sanchez and Officer Sanchez gave $1,750.00 to Guzman. After the narcotic transaction, Officer Sanchez and Guzman discussed future narcotic transactions.

8. The 5 ounces of heroin (Exhibit 1) that Officer Sanchez purchased from Guzman were later submitted to the DEA Western Laboratory, San Francisco. Exhibit 1 had a net weight of 123.7 grams and tested positive for heroin.

9. On April 30, 2008, at approximately 10:00 am, the DEA Task Force and the OPD planned a 2nd buy-walk operation. Undercover Officer L. Sanchez 8181P previously arranged a narcotic transaction with Guzman at 9725 International Blvd, Oakland (*McDonald's* parking lot) on April 30, 2008, at approximately 12:00 pm. Guzman agreed to sell 5 ounces of heroin to Officer Sanchez in exchange for $1,750.00 in U.S. currency.

10. At approximately 12:30 pm, Officer Sanchez parked his covert vehicle at 9725 International Blvd, Oakland (*McDonald's* parking lot) and waited for Guzman arrival.

11. At approximately 12:32 pm, the surveillance team followed Guzman to the 1300 block of 97th Ave. Guzman parked his Volkswagen in the 1300 block of 97th Ave. Guzman walked northbound 97th Ave and eastbound International Blvd. Guzman met Officer Sanchez in Officer Sanchez' vehicle at 9725 International Blvd (*McDonald's* parking lot). Guzman and Officer Sanchez completed the narcotic transaction. Guzman gave approximately 5 ounces of heroin to Officer Sanchez and Officer Sanchez gave $1,750.00 to Guzman. After the transaction, Officer Sanchez ordered another 5 ounces of heroin from Guzman, for purchase the same day. Officer Sanchez told Guzman that Officer Sanchez needed to pick up $1,750.00 from an unidentified coworker. Officer Sanchez told Guzman that Officer Sanchez would phone Guzman when Officer Sanchez had picked up the money from Officer Sanchez' coworker. Guzman agreed to the third narcotic transaction.

12. At approximately 1:23 pm, Officer Sanchez placed a recorded telephone call to Guzman on Guzman's cellular phone (510-798-2910). Officer Sanchez told Guzman that Officer Sanchez would arrive at the *McDonald's* parking lot in 5-10 minutes.

13. At approximately 1:31 pm, Guzman met Officer Sanchez in Officer Sanchez' vehicle at 9725 International Blvd (*McDonald's* parking lot). Officer Sanchez and Guzman completed the third narcotic transaction. Guzman gave approximately 5 ounces of heroin to Officer Sanchez and Officer Sanchez gave $1,750.00 to Guzman.

14. The 5 ounces of heroin (Exhibit 2) that Officer Sanchez purchased from Guzman were later submitted to the DEA Western Laboratory, San Francisco. Exhibit 2 had a net weight of 123.7 grams and tested positive for heroin.

15. The 5 ounces of heroin (Exhibit 3) that Officer Sanchez purchased from Guzman were later submitted to the DEA Western Laboratory, San Francisco. Exhibit 2 had a net weight of 124.9 grams and tested positive for heroin.

16. On May 14, 2008, at approximately 10:30 am, the DEA Task Force and the OPD planned a fourth buy-walk operation. Under cover Officer L. Sanchez 8181P previously arranged a narcotic transaction with Guzman at 9725 International Blvd, Oakland (*McDonald's* parking lot) on May 14, 2008, at approximately 12:00 pm. Guzman agreed to sell 5 ounces of heroin to Officer Sanchez in exchange for $1,750.00 in U.S. currency.

17. At approximately 1:10 pm, the surveillance team followed Guzman to 9725 International Blvd (*McDonald's* parking lot). Guzman entered Officer Sanchez' vehicle. Officer Sanchez and Guzman completed the fourth narcotic transaction. Guzman gave approximately 5 ounces of heroin to Officer Sanchez and Officer Sanchez gave $1,750.00 to Guzman. After the transaction, Officer Sanchez requested a sample of methamphetamine from Guzman. Guzman told Officer Sanchez that Guzman had to pick the sample of methamphetamine from Guzman's residence.

18. At approximately 1:28 pm, Guzman arrived back at 9725 International Blvd (*McDonald's* parking lot). (He had been surveilled going to his residence in the meantime.) Guzman exited Guzman's vehicle and met Officer Sanchez at Officer Sanchez' vehicle. Guzman leaned into Officer Sanchez' front passenger window and handed a sample of methamphetamine to Officer Sanchez.

19. The 5 ounces of heroin (Exhibit 4) that Officer Sanchez purchased from Guzman were later submitted to the DEA Western Laboratory, San Francisco. The laboratory report is pending.

20. The sample of methamphetamine (Exhibit 5) that Officer Sanchez obtained from Guzman was later submitted to the DEA Western Laboratory, San Francisco. The laboratory report is pending.

//

21. On June 3, 2008, at approximately 06:30 am, the DEA Task Force and the OPD planned a buy-bust operation. Undercover Officer L. Sanchez 8181P previously arranged a narcotic transaction with Guzman at 9725 International Blvd, Oakland (*McDonald's* parking lot) on June 3, 2008, at approximately 10:00-10:45 am. Guzman agreed to sell 40 ounces of heroin and 1 pound of crystal methamphetamine to Officer Sanchez in exchange for $32,000.00 in U.S. currency. For the operation, we used undercover OPD Officer J. Borello 8657P to conduct the $32,000.00 money "flash."

22. At approximately 10:20 am, Oakland Police Officer Borello drove a covert vehicle to 9725 International Blvd (*McDonald's* parking lot). Officer Borello parked in the lot and waited for Officer Sanchez' and Guzman's arrival. Officer Borrello had custody of 32,000.00 in U.S. currency for the money "flash." The currency was in the trunk of Officer Borello's vehicle.

23. At approximately 10:44 am, the surveillance team followed Guzman to the *McDonald's* parking lot. Guzman was now driving a 1994 Saturn 4 door green with California license plate 3HLF176. Officer Sanchez entered Guzman's Saturn and sat in Guzman's front passenger seat. Guzman told Officer Sanchez that Guzman only brought 20 ounces of heroin to the scene. Guzman requested payment for the first 20 ounces of heroin. Guzman said that Guzman would then pick up the other 20 ounces of heroin and drop them off to Officer Sanchez. Officer Sanchez told Guzman that Officer Sanchez and Guzman had agreed to 40 ounces of heroin and 1 pound of crystal methamphetamine therefore Officer Sanchez wanted to conduct only one transaction. Guzman removed a digital scale form under the center console of Guzman's vehicle. Guzman and Officer Sanchez weighed the 20 ounces of heroin. Guzman gave the 20 ounces of heroin to Officer Sanchez. Officer Sanchez and Guzman exited Guzman's Saturn. Officer Sanchez walked to Officer Sanchez' covert vehicle. Officer Sanchez placed the 20 ounces of heroin under his driver seat.

24. At approximately 11:05 am, Officer Sanchez and Guzman walked over to Officer Borrello's vehicle. Officer Sanchez opened the trunk of Officer Borrello's vehicle and showed the $32,000.00 "flash" to Guzman. Officer Sanchez closed the trunk of Officer Borrello's vehicle. Officer Sanchez and Guzman returned to Guzman's vehicle. Officer Sanchez and Guzman had a discussion regarding the delivery of the additional narcotics. Guzman made a couple phone calls to an unidentified associate and requested that the remainder of the narcotics (20 ounces of heroin and 1 pound of crystal methamphetamine) would be delivered to the *McDonald's* parking lot. The unidentified associate agreed to

deliver the rest of the narcotics to the *McDonald's* parking lot.

25. At approximately 11:09 am, Officer Sanchez walked back to Officer Borrello's covert vehicle and handed the car keys back to Officer Borrelo. Officer Borrello drove out of the *McDonald's* parking lot and returned to 2651 73rd Ave, Oakland (OPD Eastmont Substation).

26. At approximately 11:27 am, the surveillance team saw Guzman's Volkswagen traveling southbound in the 1300 block of 98th Avenue and and drove into the *McDonald's* parking lot. There were three occupants in the Volkswagen. The driver was later identified as Carlos Navarro. The right front passenger was later identified as Francisco Tijero. The left rear passenger was later identified as Hernan Martinez. Navarro exited the Volkswagen and walked up to Off Sanchez and Guzman. Guzman introduced Officer Sanchez to Navarro. Shortly after, Tijero and Martinez exited the Volkswagen. Tijero walked up to Officer Sanchez and Guzman. Martinez entered the Volkswagen and sat in the driver seat. Officer Sanchez asked Navarro if they (Navarro, Martinez, and Tijero) had the narcotics at the scene, Navarro stated that they had the narcotics at the scene. Navarro did not feel comfortable conducting the narcotic transaction at the scene, therefore Navarro suggested that they relocate to an unidentified residence to complete the narcotic transaction. Officer Sanchez refused to relocate. During the conversation, Tijero became apprehensive and nervous. It appeared that Tijero may have recognized Officer Sanchez from a previous incident. Tijero immediately stopped the conversation between Officer Sanchez, Guzman, and Navarro. Tijero told Guzman and Navarro that there was something that Tijero did not like about Officer Sanchez. Tijero told Navarro to get back into the Volkswagen. At this time, Officer Sanchez gave the verbal and visual signs for the arrest teams to take Guzman, Navarro, Martinez, and Tijero under arrest. While the arrest teams were in route to the scene, Navarro entered the Volkswagen and sat in the left rear seat. Tijero entered the Volkswagen and sat in the front passenger seat. Martinez quickly drove out of the *McDonald's* parking lot.

27. At approximately 11:30 am, the primary arrest team drove into the *McDonald's* parking lot and placed Guzman under arrest without incident. The surveillance team started a mobile surveillance on Martinez, Navarro, and Tijero. Martinez continued southbound on 98th Avenue in Oakland. Shortly after, we saw the secondary arrest team traveling southbound on 98th Avenue. The secondary arrest team were two OPD Officers. They were in full OPD uniform and in a semi-marked OPD vehicle. As soon as the secondary arrest team attempted to conduct a vehicle stop on the Volkswagen, Martinez sped up to approximately

6

55 mph. Martinez preceded southbound on 98th Avenue with his speed getting up to approximately 55-60 miles per hour. Martinez finally pulled over in the 10400 block of E Street and stopped the Volkswagen. We placed Martinez, Navarro, and Tijero under arrest without further incident.

28. At approximately 11:35 am, after Martinez, Navarro, and Tijero were in custody, I deployed my narcotic detection canine, *Xena*. Xena alerted to the rear portion of the Volkswagen. I searched the Volkswagen and recovered one box containing approximately 1 pound of crystal methamphetamine from the trunk of the Volkswagen. However, no heroin was recovered in the Volkswagen therefore we believed that the 20 ounces of heroin were discarded during the vehicle pursuit.

29. OPD Officers and DEA Special Agents searched the surrounding areas of where the vehicle pursuit occurred. The chase had gone approximately 7 or 8 blocks and had lasted approximately one to two minutes. Officer M. Miller 8444P recovered approximately 10 ounces of heroin from the sidewalk on 100th Ave at D St. Its packaging was the same as the packaging of the other heroin Officer Sanchez had purchased previously from Guzman.

30. At approximately 12:30 pm, Guzman, Navarro, Martinez, and Tijero were transported to 2651 73rd Avenue in Oakland (OPD Eastmont Substation). They were placed in separate interview rooms.

31. At approximately 2:50 pm, Special Agent (S/A) P. Hedquist and Task Force Officer (TFO) N. Gartner interviewed Navarro. S/A Hedquist admonished Navarro and Navarro waived his right to speak to an attorney. Navarro stated Navarro met Martinez and Tijero in Michoacan, Mexico. Martinez and Tijero were Navarro's friends. Navarro stated that Navarro drove the Volkswagen to the *McDonald's* parking lot. Navarro refused to identify Navarro's residence. Navarro also refused to a consent to search if we identified Navarro's residence. Navarro then became uncooperative and requested an attorney. S/A Hedquist and TFO Gartner terminated the interview.

32. Both Martinez and Tijero invoked their right to an attorney.

33. At approximately 03:40 pm, S/A Hedquist and TFO E. Karsseboom interviewed Guzman. S/A Hedquist admonished Guzman and Guzman waived his right to speak to an attorney. Guzman stated that Navarro, Martinez, and Tijero were Guzman's friends. Guzman stated that, this morning, Guzman drove to Navarro's residence at an unknown address on

7

Montecito Avenue in Oakland and picked up 20 ounces of heroin from Navarro (Guzman later attempted to withdraw this statement). Guzman stated that, this morning at the *McDonald's* parking lot, Guzman called Guzman's source of supply and requested additional narcotics. Guzman refused to provide any information regarding Guzman's source of supply. At first, Guzman stated that he lived at an unknown address in Hayward, California. Guzman later admitted that Guzman lived at
Guzman denied a consent to search Guzman's residence. We terminated the interview because Guzman became uncooperative. Guzman was evasive and refused to answer several questions.

34. Based on the facts that Guzman stated that Navarro resides at an unknown address on Montecito Avenue in Oakland and the surveillance team previously located Guzman's vehicle in the 100 block of Montecito Avenue, we believed that Navarro's residence was located in the 100 block of Montecito Avenue in Oakland. We conducted an inquiry on Navarro in the Consolidated Records Information Management System (CRIMS). On May 18, 2008, Navarro was arrested for driving under the influence. At the time of Navarro's arrest, Navarro identified                              as his residence address. I obtained Navarro's house keys from the Volkswagen.

35. Exigent circumstances existed to freeze Navarro's residence pending the issuance of a search warrant. Exigent circumstances existed because during Martinez' vehicle pursuit, Tijero had a cell phone against Tijero's ear therefore I believed that Tijero was making a cell phone call to inform an associate of the incident. Based on my training and experience, these phone calls often result in the removal and/or destruction of evidence in associated residences.

36. At approximately 5:00 pm, OPD Officers responded to
An individual present at the apartment complex advised us that Navarro resides in apartment #303. With Navarro keys, we entered apartment #303 and conducted a protective sweep. We then secured the scene pending the issuance of a search warrant.

37. At approximately 9:05 pm, OPD Officers served a search warrant at
#303 in Oakland (Navarro's residence). We recovered approximately one ounce of heroin, heroin packaging paraphernalia, and indicia from Navarro's residence.

38. At approximately 10:00 pm, OPD Officers served a search warrant at
in Oakland (Guzman's residence). We recovered some heroin packaging paraphernalia and

8

indicia from Guzman's residence.

39. The 20 ounces of heroin (Exhibit 6) that Officer Sanchez purchased from Guzman were later submitted to the DEA Western Laboratory, San Francisco. Exhibit 6 tested positive for heroin. The laboratory report is pending.

40. The 1 pound of crystal methamphetamine (Exhibit 7) that Officer Sanchez attempted to purchase from Guzman, Navarro, Martinez, and Tijero was later submitted to the DEA Western Laboratory, San Francisco. Exhibit 7 tested positive for methamphetamine. The laboratory report is pending.

41. The 10 ounces of heroin (Exhibit 8) that Officer Sanchez attempted to purchase from Guzman, Navarro, Martinez, and Tijero were later submitted to the DEA Western Laboratory, San Francisco. Exhibit 8 tested positive for heroin. The laboratory report is pending.

42. The 1 ounce of heroin (Exhibit 9) that Officer F. Shavies 8780P recovered from _____ (Navarro's residence) is currently in the custody of the OPD and has not been analyzed. Exhibit 9 will be submitted into the DEA Western Laboratory, San Francisco for analysis and safekeeping.

43. Each of the drug transactions were audio and video taped. The listed phone calls between Officer Sanchez and Guzman were also audio taped.

44. Based upon the aforementioned facts and my training and experience, I believe there is probable cause to believe that the defendants, Fernando Guzman, Carlos Navarro, Hernan Martinez, and Francisco Tijero did knowingly and intentionally conspire to possess, and did possess, with intent to distribute heroin, a Schedule I substance, including more than 500 grams, in violation of Title 21 United States Code, Sections 841(a)(1) and 846 and methamphetamine, a Schedule II substance, including more than 500 grams, in violation of Title 21 United States Code, Sections 841(a)(1) and 846.

//

//

//

45. I declare under penalty of perjury that the facts contained herein are true and correct to the best of my information and belief.

*[signature]*

Eric Karsseboom
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed to before me this 11th day of June, 2008.

*[signature]*

Honorable Bernard Zimmerman
United States Magistrate Judge